IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DISTRICT

| | | |
|---|---|---|
| SNUGGLYCAT INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-03110-SRB |
| | ) | |
| OPFER COMMUNICATIONS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Motion for Order to Show Cause Why Plaintiff SnugglyCat Inc.
and Non-Party Fred Ruckel Should Not be Held in Contempt of Court
for Violating this Court's Mediation and Assessment Program General Order**

Defendants Opfer Communications, Inc., Scott Opfer, Krissy Bernhardi, Chris Louzader, Rob White, Lori Robertson, James Barton, Doug Schaen, Marci Bowling, and The Bargain Show, LLC, move this Court for an order directing Plaintiff SnugglyCat Inc. and non-party Fred Ruckel (SnugglyCat's owner and president) to show cause why they should not be held in contempt of court for violating this Court's Mediation and Assessment Program General Order (ECF No. 2-1) by revealing the contents of a Court-ordered mediation session to a reporter for the *Springfield News-Leader*.

In support of its motion, Opfer states as follows:

### Fred Ruckel

Plaintiff SnugglyCat sells one product: the Ripple Rug—which is two carpet squares (one with holes and one without holes) which lay on top of each other. Snuggly-Cat's owner—and the self-proclaimed "inventor" of the Ripple Rug—is Fred Ruckel.

To say that Ruckel is a believer in the "Deep State" is an understatement, for Ruckel subscribes to the conspiracy-a-day theory. For example, in July of 2016—just months after he started SnugglyCat—Ruckel gave an interview to *Entrepreneur* maga-

zine which published his claims under the headline: "Why It's Nearly Impossible To Stop This Amazon and eBay Scheme." (Ex. 1). Following the publication of that article, Ruckel made a blog post claiming he could prove that Amazon was "stealing" his product, causing him "millions" and possibly "billions" in lost sales of his carpet squares.

**Y Hacker News**

Hello everyone. This is Fred Ruckel, the Ripple Rug inventor. I am so pleased this story has sparked a conversation amongst some of the tech elite so to speak. The article only lightly touches on all I uncovered, there is much more to come. I have a long evidence trail that shows Amazon employees are behind the vast majority of arbitraging. That's right, the people we trust with our product are the ones actually stealing it.

\* \* \*

The plain box shipping issue provided us a direct evidence trail proving it is happening internally at Amazon. I have tracked it down the the Hebron Kentucky warehouse.

\* \* \*

When I informed Amazon about the issues at Hebron, and offered my evidence, everything went haywire. Within few hours of reporting it, my entire inventory was placed in reserve (over $10,000 worth) and locked down for all of June. I was completely locked out of my own inventory. Amazon was also the multi-channel fulfillment center for my website. In a blink, both of my sales channels were shut down entirely.

\* \* \*

I proved conclusively, and repetitively that there is corruption within Amazon.

\* \* \*

I can prove millions in losses to this scheme, and with some digging, it might be billions.

\* \* \*

Fred

2

Case 6:18-cv-03110-SRB   Document 40   Filed 07/23/18   Page 2 of 17

(Ex. 2).

Later, Ruckel went on NPR's Planet Money to announce he was fighting back … by removing his product from Amazon Prime—a move he admitted cost him to lose more than half his sales.



(Ex. 3).

Business commentators noted that Ruckel's actions were irrational. In one article, for example, the author noted how Ruckel's actions were counterproductive.



(Ex. 4).

3

This—and other—publications noted that Ruckel appeared obsessed with proving his conspiracies. They note that Ruckel candidly admits to spending hours and hours—every day—trying to prove his conspiracies. The following, for example, is from Ruckel's appearance on Planet Money.



> RUCKEL: First thing in the morning, check for arbitrageurs. Last thing at night, check for arbitrageurs, send out any cease and desists before or after. It was taking up an inordinate amount of time, and it was super stressful.

(Ex. 3).

And the following is from Ruckel's interview with *Entrepreneur* magazine, in which he admits to spending hours every day trying to stop people from **buying** his product.

> **Entrepreneur**
>
> If it doesn't work? Well, he says, then something else will have to give. <mark>He sometimes spends three hours a day fighting the arbitragers.</mark> That's three hours a day he could be inventing, which is the reason he got into all this in the first place. "As my wife says, we'll have to not sweat it the way we do now," he says, "because it's too much anxiety to live with. It's super stressful."

(Ex. 1).

Still later in 2016, Ruckel told CNBC Amazon was engaged in still another wanton act—locking up his inventory just before Black Friday.



(Ex. 5).

**Rutledge & Bapst**

In early 2017—after all of the claims he made above in 2016—Ruckel brought suit in Connecticut federal court against a Connecticut company he claimed had destroyed his business. That company, Rutledge & Bapst, planned to sell a competing product to the Ripple Rug under the name "Purr N' Play."

Rutledge & Bapst hired Opfer Communications—a video production company in Springfield—to make an infomercial for the Purr N' Play. Opfer made the infomercial and sent it to Rutledge & Bapst. Once the infomercial was sent to Rutledge & Bapst, Opfer had nothing further to do with it. Opfer did not, for example, purchase airtime for the infomercial, did not decide when (or where) it would be aired, etc.

Rutledge & Bapst aired the infomercial a total of just 37 times between February 6 and February 12, 2017. It was a total flop. Rutledge & Bapst—which had spent $8,000 on air time—received a total of only 143 orders for the rug. At a retail price of $19.95 for two Purr N' Play rugs, that would have translated into revenue of just $2,800. As a result, Rutledge & Bapst pulled the plug on the Purr N' Play. Each of the 143 orders were cancelled, and none of the customers' credit cards were ever charged for the $19.95.

One month later, SnugglyCat sued Rutledge & Bapst, claiming the non-existent Purr N' Play destroyed Ruckel's business. Just days ago, *Entrepreneur* magazine published a second interview with Ruckel, in which he bragged about how his lawsuit had uncovered "a sophisticated, deep-pocketed counterfeiting operation."[1]

In his interview, Ruckel took pride while talking about the court-ordered mediation in that case, including his exchange with Rutledge & Bapst's president, Ron Steblea.

# Entrepreneur

The Ruckels and Ron Steblea sat down in a judge's chambers at the Federal Courthouse in Bridgeport, Conn. Across a conference-room-style table, the couple and their lawyers tensely confronted their adversary and his lawyers. Fred remembers Steblea sitting with a smirk.

Fred asked Steblea what he was smiling about.

He recalls Steblea responding coolly: "It's nothing personal."

"It never is with thieves," said Fred.

---

[1] This is the same "sophisticated" operation that folded after a week—and which never sold a single product.

6

(Ex. 6).

### Ruckel sues Opfer

A month after Ruckel settled with Rutledge & Bapst, he sued Opfer Communications, along with Scott Opfer, the company's president, five employees of Opfer, the head of a local cat rescue organization which provided the kittens used in the infomercial, and a second company and one of its employees. In his lawsuit, Ruckel states—correctly—that the infomercial used an actual Ripple Rug. But what he doesn't state—but what he knows from the discovery he obtained in the earlier lawsuit—is that Rutledge & Bapst sent Opfer the Ripple Rug, but told Opfer it was the Purr N' Play product.

As with his other conspiracy theories, Ruckel made every effort to garner publicity for his claims in the lawsuit. For example, when he first filed suit against Rutledge & Bapst in Connecticut, he contacted the *Springfield News-Leader* and urged them to publish a story—even furnishing the paper with photos for the story. (Ex. 7). And when he filed his suit against Opfer, he again reached out to the paper, which wrote a second story about the lawsuit. (Ex. 8).

Additionally, the recent *Entrepreneur* article is chock-full of references to Opfer Communications—and Ruckel's many references to Opfer as part of the "sophisticated, deep-pocketed counterfeiting operation." (Ex. 6).

### The lawsuit is referred to mediation

Ruckel's lawsuit against Opfer was selected for court-ordered mediation with an outside mediator. (ECF No. 2). The parties selected Ron Mitchell as their mediator, and the mediation was scheduled for July 18 in Springfield. (ECF No. 30). The lawsuit did not settle during the mediation conference, which was held that day.

7

Case 6:18-cv-03110-SRB   Document 40   Filed 07/23/18   Page 7 of 17

The following morning, July 19, 2018, when Scott Opfer returned to his office, he had a voicemail message from Greg Holman, a reporter for the *News-Leader*. At my client's request, I returned the call from Mr. Holman.

Mr. Holman began the call by stating that he had spoken with Fred Ruckel and that Ruckel had described to him what happened during the "arbitration" the prior day and asked me to comment. I advised Mr. Holman that the "arbitration" was actually a court-ordered mediation and that the mediation was confidential by Court order. I asked him how he knew about the mediation. He said that he had met with Ruckel and Ruckel's attorney, Paula Brillson Phillips, the evening before the "arbitration" and that Ruckel had called him following the "arbitration" to report on the session.

I again advised Mr. Holman that the mediation was confidential by Court order and that I could not comment on what occurred during the mediation. I also told Mr. Holman that I would advise the mediator of the violation of the Court's order by Ruckel, and that I would seek the advice of the mediator as to the next steps, which I explained could include moving to hold Ruckel in contempt.

Mr. Holman then asked me if I could discuss the facts of the case—as opposed to the mediation—and I said I could, and I then proceeded to answer Mr. Holman's questions about the lawsuit.

Upon completion of my call with Mr. Holman, I sent a letter to Mr. Mitchell (copying all counsel) advising him of my call with Mr. Holman. (Ex. 9).[2] Mr. Mitchell advised that I contact Jill Morris, the MAP Director. I did (again, copying all counsel), and Ms. Morris advised that I should file a motion with the Court. (Ex. 10).

---

[2] The version of my letter attached to this motion has been redacted so as not to disclose the contents of the mediation.

8

Initially, Ruckel's attorney, Paula Brillson Phillips, in an e-mail to Mr. Mitchell, "denie[d] the allegations set forth in Mr. Rhodes letter." (Ex. 11). The following day, however, Phillips sent an e-mail to Ms. Morris in which she acknowledged that (a) she and Ruckel had met with the reporter the day before the mediation, and (b) following the mediation Ruckel did, in fact, contact the reporter and share his view of what happened during the mediation. (Ex. 12).[3]

### The Court's Mediation and Assessment Program General Order

This Court's Mediation and Assessment Program General Order is clear: "Any communication not under oath made in connection with any proceeding in this Program shall not be disclosed to anybody unrelated to the Program by the parties, their counsel, Mediators or any other participant in the Program …." (ECF No. 2-1, at 11). The General Order was served on the Plaintiff's counsel on March 30—three and a half months before the mediation was held on July 18. (*See* ECF No. 2-1).

Additionally, per 28 U.S.C. § 651(b), the General Order is incorporated by reference into this Court's Local Rules. *See* Local Rule 16.4.

### Ruckel intentionally violated the General Order

Based on Ruckel's counsel's second e-mail, there is no dispute that Ruckel intentionally reached out to the reporter following the mediation to share Ruckel's view of what happened during the mediation. This contact occurred **after** Ruckel and Phillips had met with the reporter the day before—and had undoubtedly told the reporter they were in Springfield to attend the "arbitration" the next day. Anxious to continue his PR attack against Opfer, Ruckel clearly relished the chance to share his view of the mediation with

---

[3] The version of Phillips' e-mail attached to this motion has been redacted so as not to disclose the contents of the mediation.

9

the reporter—which Ruckel's counsel belatedly admits he did—in a further attempt to prejudice the defendants.

In this regard, Ruckel's conduct fits a pattern of hysterical behavior, including his repeated attempts to get various defendants arrested. For example, Ruckel filed a complaint with the FBI in which accused Scott Opfer and another Opfer Communications employee of "Fraud," "Larceny" and "Intellectual property theft." (Ex. 13). In his complaint to the FBI Ruckel described how he—and he alone—had been able to capture these rogue criminals.

> Act (FDUTPA). We are seeking Federal action as well as all three states. This ring of 'bad actors' have performed the same scheme for more than a decade shifting companies and states. They have alluded most authorities through their many loopholes, however we documented everything and have irrefutable evidence to prove our case.

(Ex. 13).

When Ruckel couldn't get the FBI interested, he made a complaint to the Missouri Attorney General, in which he falsely claimed to be a consumer.

> **Consumer Complaint No. CC-2017-07-002537 Details**
> **Consumer Information**
> Name: MR Frederick Ruckel
> Address: 370 East Conesville Road
> Gilboa, NY 12076

(Ex. 14). He also falsely claimed he had been charged $31.85 on his credit card—when, in fact, he had never been charged anything.

> Financial Loss: Yes; Sales Method: Bait And Switch; Payment Method: Credit Card; Amt Paid: 31.85

(Ex. 14).

10

Ruckel also called the Springfield Police, who sent detectives from the Special Victims Unit to Scott Opfer's office. When the police failed to arrest Scott Opfer, Ruckel shifted his focus to Marci Bowling—who runs a local cat rescue organization and who provided the kittens used for the infomercial. Ruckel wrote a lawyer-friend of Ms. Bowling's who had offered to intercede on Ms. Bowling's behalf, initially telling the lawyer:

> We are seeking Class D/E felony charges as well as misdemeanor charges against all conspirators involved in this production. Marci Bowling is a witness to this crime and we would like her statement of account.

(Ex. 15). When the lawyer said Ms. Bowling had no information about any crime, Ruckel abruptly reversed course, threatening Ms. Bowling with prosecution, telling the lawyer:

> Please be advised, we have provided Marci Bowling's contact details to the police for investigation. Upon good information, Marci is more involved than she alluded. We felt you may want to know.

(Ex. 15).

As such, it is plain that Ruckel's disclosure to the newspaper of his view of what transpired at the mediation was not a mere slip of the tongue, but a purposeful act of a vindictive man intent on inflicting as much injury as he can on everyone—and anyone— he chooses to maliciously target.

**This Court's contempt power**

"The power to punish for contempt … is essential to the preservation of order in judicial proceedings, and to the enforcement of … orders … of the courts and, consequently, to the due administration of justice." *In re Ex Parte Robinson*, 86 U.S. 505, 510 (1874). "[W]ithout the contempt power, 'what the Constitution now fittingly calls the

11

"judicial power of the United States" would be a mere mockery.'" *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 504 (8th Cir. 2000).[4]

A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnor violated a "clear and specific" order. *Id.* at 505; *Chaganti & Assoc. v. Nowotny*, 470 F.3d 1215, 1223 (8th Cir. 2006). Additionally, the movant must show the contemnor acted intentionally, which only means that his or her action was not accidental. *See Hubbard v. Fleet Mortg. Co.*, 810 F.2d 778, 781 (8th Cir. 1987) (explaining that intent requirement in contempt cases means only "a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation"). Once the moving party meets its initial burden of proof, the burden shifts to the alleged contemnor to show an inability to comply. *Chicago Truck Drivers*, 207 F.3d at 505.

If the court determines that the party seeking contempt has met its burden—and the defending party defending has not—the court may consider civil contempt sanctions that are both "coercive and remedial." *Jake's, Ltd, Inc. v. City of Coates*, 356 F.3d 896, 902 (8th Cir. 2004). Proper civil contempt sanctions are "those penalties designed to compel future compliance with a court order," and "are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826-27 (1994).

---

[4] Additionally, Federal Rule of Civil Procedure 16(f)(1) authorizes a court to issue a contempt order pursuant to Rule 37(b)(2)(A)(a)(vii) for violation of any pretrial order other than an order compelling a physical or mental examination.

Additionally, the MAP General Order itself provides that a violation of the Order may result in the imposition of sanctions. *See* MAP General Order Section X.

Both a party—and any non-party who aids or abets a party—can be held in contempt. *See Independent Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917. 920 (8th Cir. 1998) (even "a non-party may be held in contempt where the nonparty aids or abets a named party in a concerted violation of a court order").

Civil contempt proceedings are ancillary to the underlying proceeding and are ordinarily begun by the filing of a motion setting forth the alleged contemptuous act and requesting the issuance of an order to show cause directed to the alleged contemnor. *See* MOORE'S FEDERAL PRACTICE 3rd § 65.81 (2010).

### Opfer has met its burden

Opfer has plainly met its burden. First, this Court's General Order is clear and specific: "Any communication not under oath made in connection with any proceeding in this Program shall not be disclosed to anybody unrelated to the Program by the parties, their counsel, Mediators or any other participant in the Program …." (ECF No. 2-1, at 11).

Second, Ruckel plainly violated that Order. As his own attorney now admits (after initially denying), Ruckel specifically contacted the *News-Leader* reporter for the very purpose of conveying to the reporter what had transpired during the mediation. Moreover, the only things which occurred during the mediation were "communication[s] not under oath." There were no physical actions taken—the entire mediation was conducted via "communication[s]." It was these "communication[s]" that Ruckel disclosed to the newspaper reporter.

Third, Ruckel's actions were clearly intentional. He had every opportunity to avoid the violation by simply not calling the reporter following the mediation. As Ruck-

13

el's lawyer admits, she and Ruckel had already met with the reporter the day before the mediation, and had given the reporter their side of the story. There was no need for Ruckel to contact the reporter following the mediation—**other than to report on the mediation**.

Moreover, this is not the first time Ruckel has done this. Recall that when he gave his recent interview to *Entrepreneur* magazine, he openly discussed his exchange with Rutledge & Bapst's president, Ron Steblea, during the court-ordered mediation in that lawsuit.

> # Entrepreneur
>
> The Ruckels and Ron Steblea sat down in a judge's chambers at the Federal Courthouse in Bridgeport, Conn. Across a conference-room-style table, the couple and their lawyers tensely confronted their adversary and his lawyers. Fred remembers Steblea sitting with a smirk.
>
> Fred asked Steblea what he was smiling about.
>
> He recalls Steblea responding coolly: "It's nothing personal."
>
> "It never is with thieves," said Fred.

(Ex. 6). Like here, Ruckel did so in a blatant attempt to portray Steblea in a derogatory fashion.[5]

Finally, there is utterly no question that Ruckel was acting by and on behalf of SnugglyCat. In fact, the very reason that Ruckel was in Springfield was to act as Snug-

---

[5] Phillips, Ruckel's attorney in this lawsuit, apparently sees nothing wrong with Ruckel breaching the confidentiality of the court-ordered mediation in the prior Connecticut lawsuit, for she recently sent out e-mail blast with the *Entrepreneur* article. (Ex. 16).

14

glyCat's representative during the mediation. Accordingly, he can be held in contempt, along with SnugglyCat.

### The importance of confidentiality

Finally, it is important to note that the obligation of confidentiality is not a mere formality, but is, instead, of utmost importance. "'[I]t is beyond doubt that maintaining the confidentiality of mediation communications is a *sine qua non* for preserving the integrity of court-sponsored mediation sessions.'" *Hand v. Walnut Valley Sailing Club*, No. 10-1296-SAC, 2011 U.S. Dist. LEXIS 80465, at *13 (D. Kan. July 20, 2011) (quoting *Jones v. Metropolitan Life Ins. Co.*, 2010 U.S. Dist. LEXIS 113219, 2010 WL 4055928, 10 (N.D. Cal. 2010)), *aff'd*, 475 Fed. Appx. 277 (10th Cir. 2012) (collecting cases).

Here, Ruckel has made a mockery of that concept by immediately sharing with a reporter his view of what happened during the mediation—all as part of his concerted effort to prejudice the defendants. If defendants had known this was Ruckel's intent, they would have simply stood mute during the entire proceeding, thereby defeating the entire purpose of the mediation session.

WHEREFORE, Defendants Opfer Communications, Inc., Scott Opfer, Krissy Bernhardi, Chris Louzader, Rob White, Lori Robertson, James Barton, Doug Schaen, Marci Bowling, and The Bargain Show, LLC, request that this Court order Plaintiff SnugglyCat Inc. and non-party Fred Ruckel to show cause why they should not be held in contempt of court, together with ordering SnugglyCat Inc. to pay defendants' attorney fees, and such other and further relief as this Court deems just.

15

Case 6:18-cv-03110-SRB   Document 40   Filed 07/23/18   Page 15 of 17

Respectfully submitted,

LATHROP GAGE LLP

By: */s/ Bernard J. Rhodes*
Bernard J. Rhodes (MO #29844)
Eric Sidler (MO #69531)
2345 Grand Blvd., Ste. 2800
Kansas City, MO 64108
Tele: 816-292-2000; Fax: 816-292-2001
Email: brhodes@lathropgage.com
esidler@lathropgage.com

ATTORNEYS FOR DEFENDANTS
OPFER COMMUNICATIONS, INC.,
SCOTT OPFER, KRISSY BERNHARDI,
CHRIS LOUZADER, ROB WHITE, LORI
ROBERTSON, JAMES BARTON, DOUG
SCHAEN, MARCI BOWLING AND THE
BARGAIN SHOW, LLC

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above pleading was filed on this 23rd day of July, 2018, using the Court's ECF system, which will generate notice to the following counsel of record:

Steven H. Schwartz
Brown & James, P.C.
800 Market Street, 11th Floor
St. Louis, MO 63101

and

Allison Louise Greenfield
Brown & James, P.C.
2345 Grand Blvd., Ste. 2100
Kansas City, MO 64108

and

Paula Brillson Phillips
Jessica Pfau
Phillips & Pfau, LLP
817 Broadway
New York, NY 10003

/s/Bernard J. Rhodes
An Attorney for Defendants Opfer Communications, Inc., Scott Opfer, Krissy Bernhardi, Chris Louzader, Rob White, Lori Robertson, James Barton, Doug Schaen, Marci Bowling, and The Bargain Show, LLC